| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: ᵒ/ ᵓ ᵗ / ᵕ᷾X |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NILE RODGERS,

                            Plaintiff,

            -against-                                    04 Civ. 1149 (RJH)

                                                **MEMORANDUM OPINION**
                                                   **AND ORDER**
NORMA JEAN WRIGHT and LUCI MARTIN,

                            Defendants.

Plaintiff Nile Rodgers, a founder of the music group Chic brings this trademark
infringement action against two singers who once performed as part of Chic, defendants
Norma Jean Wright and Luci Martin. Rodgers is the owner of a registered trademark in
"Chic," and, along with his late partner Bernard Edwards, has exploited the mark in
commerce continuously since 1977. Wright and Martin, who claim no ownership of the
mark, have performed in the US and abroad as "Ladies of Chic" and "First Ladies of
Chic," and sometimes simply as "Chic." On July 13, 2006, this Court issued a
preliminary injunction enjoining Wright and Martin's infringement of Rodgers'
trademark, and issued an amended preliminary injunction on December 22, 2006. Before
the court are cross-motions for summary judgment on plaintiff's trademark infringement
claims. For the reasons that follow, the Court grants plaintiff's motion for summary
judgment and denies defendants' motion.

## BACKGROUND

### I. Plaintiff's Ownership and Use of the Chic Mark

In 1977, Rodgers and Bernard Edwards (who passed away in April 1996) formed a New York partnership under the name Chic, and began using the name to describe their vocal and instrumental music group. (Rodgers Decl. ¶¶ 2–7, July 6, 2007; Defs.' Opp'n 1–2.) From 1977 until 1982, Rodgers and Edwards signed contracts, put out albums, and performed as Chic. (Rodgers Decl. ¶¶ 3–7, July 6, 2007; Defs.' Opp'n 1–2.) In 1982, Rodgers and Edwards, through the Chic partnership, obtained a service mark (the "1982 Registration") for "Chic" in the United States Patent and Trademark Office (the "USPTO") in the Principal Register. (Rodgers Decl. Ex. H, July 6, 2007.) The trademark was for "entertainment services rendered by a vocal and instrumental music group." (*Id.*) Rodgers and Edwards continued to use the mark in commerce by performing as Chic and by authorizing the sale and distribution of Chic's recordings. (Rodgers Decl. ¶ 16, July 6, 2007.) When Edwards passed away in 1996, the Chic New York partnership dissolved as a matter of law. (Pl.'s 56.1 Statement ¶ 15; Defs.' Opp'n 2); N.Y. Partnership Law § 62 (4). Rodgers, the sole surviving partner, continued to use the mark in commerce, releasing a Chic album in 1999, entitled "Chic Live at the Budokan." (Rodgers Decl. ¶ 15, July 6, 2007.) The existing Chic trademark registered to the partnership was set to expire on March 3, 2004. (Defs.' 56.1 Statement ¶ 21.) On October 15, 2003, before the trademark lapsed, Rodgers filed for a Chic trademark registration in his name; on September 24, 2004 the USPTO registered the mark (the "2004 Registration"). (Rodgers Decl. Ex. I, July 6, 2007.) Rodgers has performed and

2

continues to perform as Chic throughout the US, Western Europe, and Japan. (*Id.* ¶ 25.)

## II. Defendants' Use of the Mark

Wright performed as a vocalist on at least one Chic album, while Martin performed on three others. (Defs.' 56.1 Statement ¶¶ 10–13.) Wright and Martin performed as vocalists in at least two televised performances. (*Id.* ¶¶ 14–15.) At some point, perhaps as early as 1996, Wright and Martin began performing together, and identified themselves, in varying ways, as having an association with Chic. (Defs.' 56.1 Statement ¶ 16.) Since 2003, both in the US and abroad, Wright and Martin have billed themselves, or have been billed as, "Chic," "Ladies of Chic," "The First Ladies of Chic," "The Original Ladies of Chic," "Chic: Live!," and "Les Chic." (Rodgers Decl. ¶ 26 & Exs. J–AA, July 6, 2007.) To promote a concert performance by Wright and Martin in Philadelphia in May 2005, the venue billed the pair as the "Original Ladies of Chic" and the "First Ladies of Chic" and described them as the "*original artists* singing all the *original hits*." (*Id.* ¶ 26 & Ex. T (emphasis in original).) Online, defendants held themselves out as available for bookings in the US and abroad as "First Ladies of Chic," (*Id.* ¶ 26 & Ex. L, M, R, U) and maintained a "First Ladies of Chic" website at www.ladiesofchic.com (*Id.* ¶ 26 & Ex. R (contents of website before this Court's July 2006 preliminary injunction); Wright Decl. ¶ 9 & Ex. D, Oct. 13, 2006 (contents of website after this Court's July 2006 preliminary injunction)). At least once, a concert promoter who had sought out Rodgers to perform as Chic but had been unwilling to pay Rodgers' fee, instead booked defendants to perform as "Chic" at a lower price. (Peltz Decl. ¶ 6 & Ex. B at 233–36, June 14, 2007; *see also* Defs.' Opp'n 9 ("[Rodgers] has

3

been offered the type of jobs that defendants were offered. It is simply that he will not perform for the amount of money that the promoters offer.").) Until corrected by defendants pursuant to the July 2006 preliminary injunction, a Chic fan website featuring frequent news updates, www.chictribute.com, mistakenly advertised a performance by defendants as being a performance of Chic. (Wright Decl. ¶ 9 & Ex. D, Oct. 13, 2006.)

It is undisputed that Wright and Martin were never partners in the Chic New York partnership (Rodgers Decl. ¶¶ 2–7, 10–11, 13 & Exs. A–C, E, G), and defendants make no claim that they used the Chic mark in commerce before Rodgers and Edwards. Defendants never sought or received permission from Rodgers to use the Chic mark. (Cinque Decl. Ex. A, July 6, 2007; Rodgers Decl. ¶ 17, July 6, 2007.)

## III. The July 13, 2006 Preliminary Injunction and the December 22, 2006 Amended Preliminary Injunction

Plaintiff filed his complaint on February 12, 2004, and filed an amended complaint on March 9, 2006. Defendants filed an answer to the amended complaint on April 13, 2006. On July 13, 2006 this Court issued a preliminary injunction enjoining defendants Wright and Martin from:

(a) using, publishing, marketing, selling, infringing or commercially exploiting the word "Chic," . . . except that defendants may describe themselves as former vocalists or members of "Chic";

(b) using any reproduction, copy or colorable imitation of the word "Chic" or any variant thereof in connection with publicity, promotion, sale or advertising of goods or services of defendants including, without limitation, public appearances, concert performances, phonorecords or audio visual devices, except that defendants may describe themselves as former vocalists or members of "Chic"; and

4

(c) infringing that certain trademark "Chic" bearing Registration No. 2,888,767 . . . .

On December 22, 2006 the Court entered an amended preliminary injunction

enjoining defendants Wright and Martin from:

(a) using . . . or commercially exploiting the word "Chic," either alone or in conjunction with other words or symbols or any variant of the word "Chic," except that defendants may describe themselves as "former lead vocalists of Chic" or "former members of Chic" or "formerly of Chic";

(b) using any reproduction, copy, or colorable imitation of the word "Chic" or any variant thereof in connection with publicity, promotion, sale, or advertising of goods or services of defendants . . . except that defendants may describe themselves as "former lead vocalists of Chic" or "former members of Chic" or "formerly of Chic," so long as the word "Chic" is not given more prominence than defendants' names and the phrases "former lead vocalists of Chic," "former members of Chic," and "formerly of Chic" are not larger than one-half (½) the font size of defendants' names; and

(c) infringing that certain trademark "Chic" bearing Registration No. 2,888,767.

The amended preliminary injunction also required that defendants notify promoters,

advertisers, and venues in advance and in writing of the Court-ordered limits on the use

of the word Chic. Defendants were also required to obtain a signed verification from

promoters and venues acknowledging these limitations, and to provide this verification to

plaintiff's counsel "prior to any performance." Defendants were also to "inspect the

premises of each venue in which they perform, including the marquees, the tickets, and

any posters and other advertising and promotional materials" and to notify plaintiffs in

writing within seven days of learning of any materials violating the injunction.

5

# DISCUSSION

## I.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a

party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Distasio v. Perkin*

*Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998); *Conway v. Microsoft Corp.*, 414 F. Supp.

2d 450, 458 (S.D.N.Y. 2006). A party moving for summary judgment may discharge its

burden "by 'showing'—that is, pointing out to the district court—that there is an absence

of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

A fact is considered "material" for purposes of Rule 56 if it "might affect the

outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). Whether a material issue is "genuine" depends on whether the evidence

is of a type that would permit a reasonable jury to return a verdict in favor of the

nonmoving party. *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). In showing that a

genuine issue of material fact exists, the nonmoving party may not rely on "[t]he mere

existence of a scintilla of evidence" to support its position but must instead proffer

"evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County*

*of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (citing *Anderson*, 477 U.S. at 252).

## II.     Trademark Infringement

### A.     Plaintiff's Ownership and Prior Use of a Protectable Mark

Section 32 of the Lanham Act prohibits the use in commerce, without consent, of
any "registered mark in connection with the sale, offering for sale, distribution, or
advertising of any goods," in a way that is likely to cause confusion. 15 U.S.C. §
1114(1)(a). Section 43(a) prohibits the infringement of unregistered, common law
trademarks. See id. § 1125(a)(1); *Two Pesos v. Taco Cabana*, 505 U.S. 763, 768 (1992)
("[I]t is common ground that § 43(a) protects qualifying unregistered trademarks . . . .").
"To prevail on a trademark infringement claim under either of these provisions, a plaintiff
must demonstrate that it has a valid mark entitled to protection and that the defendant's
use of it is likely to cause confusion." *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113,
117 (2d Cir. 1999) (internal quotations omitted). To qualify for registration in the first
place or for an unregistered mark to be protectable under § 43(a), the "mark must be
sufficiently 'distinctive' to distinguish the registrant's goods from those of others." *Louis
Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006) (internal
quotations omitted). "The degree to which a mark is entitled to protection under the Act
depends on whether the mark is classified as (a) generic, (b) descriptive, (c) suggestive,
or (d) fanciful or arbitrary." *Estee Lauder v. Gap, Inc.*, 108 F.3d 1503, 1508 (2d Cir.
1997). Generic marks are unprotectable, and descriptive marks are protectable only when
they acquire a "secondary meaning." *Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d
158, 163 (2d Cir. 2004). Suggestive marks—those marks that "do not directly describe
goods or services or their attributes, but rather are suggestive of them"—are protected

7

without regard to secondary meaning. *TCPIP Holding Co. v. Haar Commc'ns*, 244 F.3d 88, 94 (2d Cir. 2001). "The most distinctive marks—those receiving the most protection—are marks that are arbitrary or fanciful in relation to the products (or services) on which they are used." *Playtex Prods.*, 390 F.3d at 163 (internal quotations omitted). A mark acquires a "[s]econdary meaning . . . when the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d at 117 (internal quotations omitted). Moreover, "[a] decision by the USPTO to register a mark without proof of secondary meaning affords a rebuttable presumption that the mark is more than merely descriptive." *Arrow Fastener*, 59 F.3d at 393.

Where a mark is entitled to protection, "[s]o long as a person is the first to use a particular mark to identify his goods or services in a given market, and so long as that owner continues to make use of the mark, he is entitled to prevent others from using the mark to describe their own goods in that market." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007).

In this case, there is no suggestion that the Chic mark is not protectable. (*See* Defs.' Opp'n 4–5.) Nor do defendants contend that their use predates that of defendants. (*See* Defs.' Mot. 1–2.) Rather, defendants launch hyperbolic[1] accusations regarding the effect of the lapse of the 1982 Registration, (incorrectly) claiming both that plaintiff failed to amend his complaint to refer to the 2004 Registration and that this Court's issuance of preliminary relief was premised on a belief in the continuing viability of

---

[1] In defendants' memorandum of law in support of their motion for summary judgment, Section A of the Statement of Facts is styled "Lies to this Court."

8

the1982 Registration. (Defs.' Mot. 5, 7–8.) Unfortunately, the heat of defendants'
arguments is accompanied by precious little light. It is possible that defendants believe
that the lapse of the1982 Registration constituted abandonment of the mark. However,
"the absence of a registration creates no contrary presumptions," *Goya Foods, Inc. v.
Tropicana Products, Inc.*, 846 F.2d 848, 854 (2d Cir. 1988), and "allowing a federal
registration to expire does not per se prove abandonment." 3 J Thomas McCarthy,
*McCarthy on Trademarks and Unfair Competition* § 17:4 n.5 (4th ed.); *see Baker v.
Parris*, 777 F. Supp. 299, 303 (S.D.N.Y. 1991) (finding no abandonment where
trademark owner allowed the registration to lapse as there was no dispute that trademark
owner had continued to use the mark in commerce). Moreover, "[t]he party asserting
abandonment bears the burden of persuasion with respect to two facts: (1) non-use of the
mark by the legal owner, and (2) lack of intent by that owner to resume use of the mark in
the reasonably foreseeable future." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d
Cir. 2007). Thus, here, where it is undisputed that plaintiff has continued to use the mark
in commerce since 1982, and that he applied to register the mark anew before the 1982
Registration expired, it is clear that defendants have not met their burden of
demonstrating abandonment of the mark. *See Marshak v. Treadwell*, 58 F. Supp. 2d 551,
575 (D.N.J. 1999) ("A successful musical group does not abandon its mark unless there is
proof that the owner ceased to commercially exploit the mark's secondary meaning in the
music industry.").

It is also possible that defendants believe that injunctive relief is not available for
violations of a common law, unregistered trademark. (Defs.' Mot. 6.) Such a view is
plainly inconsistent with the Lanham Act. *See* 15 U.S.C. § 1116(a) (giving courts "power

9

to grant injunctions . . . to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 43."). Whatever import defendants ascribe to the lapse of the 1982 Registration,[2] no genuine issue of material fact remains as to plaintiff's prior use and ownership of the Chic mark. It is similarly beyond dispute that plaintiff's mark is protectable. The Chic mark was twice-registered with the USPTO without reference to a secondary meaning, and defendants have put forward no argument or evidence to rebut the presumption that the mark is therefore not merely descriptive.

## B. Likelihood of Confusion

To succeed on his Lanham Act claims, plaintiff must not only demonstrate prior use and ownership of a protectable mark, but also that defendants' use of the mark is likely to cause confusion. *See Virgin Enters. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). "The likelihood-of-confusion inquiry turns on whether numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Playtex Prods.*, 390 F.3d at 161 (internal quotations omitted). To determine whether confusion is likely to arise, courts in the Second Circuit apply the eight factor test set forth in *Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). *See Playtex Prods.*, 390 F.3d at 161–62. The eight factors are: (1) the strength of plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the

---

[2] It may be that defendants are merely claiming that plaintiff may not be awarded statutory damages for defendants' use of a counterfeit mark during the period between March 3, 2004 (when the 1982 Registration expired) and September 14, 2004 (when the 2004 Registration was registered by the USPTO). (Defs' Mot. 6); *see also* 15 U.S.C. § 1117(a)–(c). However, as the Court defers decision on damages, it does not now address the merits of this argument.

products; (5) actual consumer confusion between the two marks; (6) the defendant's intent in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group. *Id.* at 162. In balancing these factors, "a court should focus on the ultimate question of whether consumers are likely to be confused." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000). Applying the eight *Polaroid* factors to the undisputed facts of this case, the Court determines that each factor is either neutral or tips in the direction of a likelihood of confusion.

(1) The strength of a mark is determined by the mark's "tendency to identify the goods sold under the mark as emanating from a particular . . . source." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 217 (2d Cir. 2003) (internal quotations omitted). Plaintiff's mark is at least moderately strong. *See Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005). It is, as noted above, unquestionably suggestive. Moreover, it is beyond dispute that the release of several popular albums under the Chic mark along with consistent touring since 1977 has created a tendency in the minds of consumers to associate the Chic mark in the context of performing music groups with Rodgers and Edwards' band.

(2) "When the secondary user's mark is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them in assessing the likelihood that consumers will be confused." *Virgin Enters. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003). Here, defendants sometimes used the identical mark but other times performed as the "First Ladies of Chic" or the like. The Court finds that the latter formulation and those like it are sufficiently similar to Chic so as to cause

confusion. *See Marshak v. Thomas*, No. 1998 Civ. 2550, 1998 WL 476192, at *8 (E.D.N.Y. June 11, 1998) (finding "[defendant's] use of 'Charlie Thomas' Drifters' sufficiently similar to [plaintiff's] mark 'The Drifters' as to create a likelihood of confusion"); *see also Brother Records, Inc. v. Jardine*, 318 F.3d 900 (9th Cir. 2003) (affirming permanent injunction prohibiting former band member from using "The Beach Boys," "The Beach Boys Family and Friends," and other similar combinations); *A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972) (Friendly, J.) (finding that defendant's pens marked LaCrosse by Bradley infringed on plaintiff's Cross mark as "a purchaser could well think plaintiff had licensed defendant as a second user and the addition is thus an aggravation, and not a justification") (internal quotations omitted).

(3) As to the proximity of the products in the marketplace, the Second Circuit has observed that "[t]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enters. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003). Here defendants directly compete with plaintiff—performing similar music in the same markets. In this context, factor (4), "bridging the gap," is not a meaningful inquiry.

(5) There, there is some evidence in the record of actual confusion, as the proprietor of www.chictribute.com initially mistook news of a performance by defendants as a performance by Chic before being corrected by defendants pursuant to an injunction issued by this Court. Although "evidence of actual consumer confusion is particularly relevant to a trademark infringement action," *Streetwise Maps v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998), "the absence of actual confusion alone is not

12

dispositive of the question of likelihood of confusion," *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995).

(6) As to defendants' intent in adopting the mark, it is beyond dispute that defendants attempted to take advantage of the name recognition and goodwill associated with the Chic mark. There is only limited evidence in the record concerning factors (7) and (8): the quality of the defendant's product and the sophistication of the relevant consumer group. Not surprisingly, plaintiff finds defendants efforts to be artistically inferior, but the Court attaches little weight to this judgment. Similarly, there is no evidence before the Court regarding the general sophistication of those likely to attend Chic concerts.

Assessing the *Polaroid* factors together as a whole, the Court finds little difficulty in concluding that defendants' use of "Chic," "Ladies of Chic," "First Ladies of Chic," "Original First Ladies of Chic," and similar marks was likely to confuse consumers.

## C. Fair Use Defense

"Fair use is a defense to liability under the Lanham Act even if a defendant's conduct would otherwise constitute infringement of another's trademark." *Cosmetically Sealed Indus. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997); *see also New York Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 389 F.Supp.2d 527, 545 (S.D.N.Y. 2005) ("Both sections 32(1) and 43(a) are subject to a defense of 'fair use,' and particularly, a defense that the use of the marks is a "nominative" or 'descriptive' use of the marks to describe an aspect of the defendant's products or services."). "To come within the fair use defense, defendants must have made use of [plaintiff's] mark . . . (1) other than as a mark, (2) in a descriptive sense, and (3) in good

faith." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000). In this case, defendants used Chic as a mark, as they held their performances out as being by Chic, Ladies of Chic, First Ladies of Chic, The Original First Ladies of Chic, and the like. *See TCPIP Holding Co. v. Haar Commc'ns.*, 244 F.3d 88, 104 (2d Cir. 2001) ("Haar uses the name 'thechildrensplace.com' as the address, or name, of its website, and has similarly reserved all the other names in contention. This is not simply an adjectival use, as might be the case if Haar named his website otherwise, but referred to it in publicity materials as 'a children's place.' Haar's use is as a mark.). Moreover, defendants have employed the Chic mark to refer to their services "to trade on the good will of the trademark holder by creating confusion as to source or sponsorship" and therefore did not act in good faith. *EMI Catalogue*, 228 F.3d at 66; *see also Marshak v. Thomas*, No. 1998 Civ. 2550, 1998 WL 476192, at *8 (E.D.N.Y. June 11, 1998). Defendants' intent in this regard is evidenced in particular by the prominent placement of the Chic mark in defendants' promotional materials. *See Brother Records v. Jardine*, 318 F.3d 900, 908 (9th Cir. 2003). In sum, the Court finds that no genuine issues of material fact remain as to plaintiff's entitlement to judgment that defendants infringed its Chic mark.

## III. Extraterritorial Application of the Lanham Act

Putting to one side defendants' domestic infringements, defendants contend their performances in Europe are extraterritorial acts that fall outside the reach of the Lanham Act and may not be enjoined. The Act prohibits the use of infringing marks "in commerce," 15 U.S.C. § 1114(1), and defines commerce to "mean[] all commerce which

14

may be lawfully regulated by Congress." *Id.* § 1127. Given the breadth of the statutory language, it is unsurprising that the Supreme Court has held that "Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of those acts are done outside the territorial limits of the United States," *Steele v. Bulova Watch Co., Inc.*, 344 U.S. 280, 286 (1952), and that the Congress exercised that power in providing for extraterritorial application of the Lanham Act, *id.* at 286–87. Subsequently, the Second Circuit identified the familiar "*Vanity Fair*" factors for determining whether the Lanham Act should be applied extraterritorially: (1) whether the defendant's conduct has a substantial effect on United States commerce; (2) whether the defendant is a United States citizen; (3) and whether there exists a conflict between defendant's trademark rights under foreign law and plaintiff's trademark rights under domestic law. *See Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956); *Atl. Richfield Co. v. Arco Globus Int'l Co.*, 150 F.3d 189, 192 (2d Cir. 1998) (reciting *Vanity Fair* factors). In *Vanity Fair*, the court accepted as true plaintiff's allegation that defendant's use of a mark identical to plaintiff's had a substantial effect on U.S. commerce. However, because defendant was a Canadian citizen employing a trademark in Canada properly registered under Canadian law, the Court declined to give the Lanham Act extraterritorial effect. *Vanity Fair*, 234 F.2d at 642–43. In the present case, both defendants are U.S. citizens and neither possesses registered marks in the European countries in which they have performed. Whether the presence of one or both of these factors (that is, citizenship and absence of conflicting rights) may be necessary to sustain extraterritorial jurisdiction, they are apparently not sufficient. Indeed, the Second

15

Circuit has noted that it has *never* applied the Lanham Act to extraterritorial conduct absent a substantal effect on U.S. commerce. *See Atl. Richfield*, 150 F.3d at 192 n.4.

The case law in this Circuit is somewhat unclear as to what sort of substantial effect on U.S. commerce is required for a court to exercise jurisdiction over a U.S. citizen's foreign infringement of a U.S. trademark. U.S. consumer confusion or harm to the plaintiff's goodwill in the U.S. certainly suffices. *See Atl. Richfield*, 150 F.3d at 192–93; *Piccoli A/S*, 19 F. Supp. 2d at 170. Financial harm to an American trademark owner whether from the loss of foreign sales or the damage to the trademark owner's reputation abroad is at the very least, relevant to determining whether foreign infringement has a substantial effect on U.S. commerce. *See Bulova Watch*, 344 U.S. at 287 (citing fact that defendant's "competing goods could well reflect adversely on Bulova Watch Company's trade reputation in markets cultivated by advertising here as well as abroad" as a factor weighing in favor of extraterritorial application of Lanham Act); *Totalplan Corp. of Am. v. Colborne*, 14 F.3d 824, 830–31 (2d Cir. 1994) ("Totalplan has not shown that any foreign sales of Love cameras have been diverted from it by Lure's shipment to Japan."); *Software AG, Inc. v. Consist Software Solutions*, No. 08 Civ. 389 (CM), 2008 U.S. Dist. Lexis 19347, at *39–*41 (S.D.N.Y. Feb. 21, 2008) (finding substantial effect of foreign false advertising in violation of the Lanham Act because violation jeopardized valuable contracts that were to be performed in the U.S. by plaintiff); *Aerogroup Int'l v. Marlboro Footworks*, 955 F. Supp. 220, 229 (S.D.N.Y. 1997) ("Courts in this district have also found a substantial effect on commerce where an American plaintiff's foreign sales have been diverted, and where there is danger of irreparable injury to a plaintiff's good will and reputation." (internal citations omitted); *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940,

16

952 (S.D.N.Y. 1994) "[D]iversion of [foreign] sales and adverse impact on foreign licensees can constitute substantial impact on United States commerce.")

The weight to be given to the domestic commercial activities of American citizens that support foreign infringement is less clear. *Compare Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 170–71 (S.D.N.Y. 1998) *with P&G v. Colgate-Palmolive Co.*, No. 96 Civ. 9123 (RPP), 1998 U.S. Dist. LEXIS 17773, at *199 n.31 (S.D.N.Y. Nov. 5, 1998). In *Atlantic Richfield*, the Second Circuit rejected the notion that *Bulova* held that "a defendant's domestic activity, even if 'essential' to infringing activity abroad is alone sufficient to constitute a substantial effect on United States commerce." *Atl. Richfield*, 150 F.3d at 193. The court then found that "even if *Bulova* is read to indicate that a defendant's infringing extraterritorial conduct has a substantial effect on United States commerce whenever some non-infringing domestic activity is 'essential' to that extraterritorial conduct," none of defendant's domestic activities were "essential." *Id.* Summing up its decision, the Second Circuit observed that the "mere presence of the alleged infringer in the United States" will not constitute a substantial effect on United States commerce where:

(i) an alleged infringer's foreign use of a mark does not mislead American consumers in their purchases or cause them to look less favorably upon the mark;

(ii) the alleged infringer does not physically use the stream of American commerce to compete with the trademark owner by, for example, *manufacturing, processing, or transporting* the competing product in United States commerce; and

(iii) none of the alleged infringer's American activities materially support the foreign use of the mark.

*Id.* at 193.

17

*Atlantic Richfield* plainly left open the possibility that an American infringer's physical use of the stream of American commerce to compete with the trademark owner could constitute a substantial effect on American commerce, at least where those domestic activities materially support the foreign use of the mark and are in themselves domestic infringements of the mark likely to confuse U.S. consumers. None of those factors were in play in Atlantic Richfield, as the plaintiff there had shown, "[a]t best ... that [defendant] ha[d] a geographic presence in the United States and, by inference from that fact, that some decision-making regarding [defendant's] foreign activities ha[d] taken place on American soil." Id. After *Atlantic Richfield* courts in this Circuit have closely examined the nature and effect of an infringer's domestic activities in support of foreign trademark infringement. *See World Book, Inc. v. IBM Corp.*, 354 F. Supp. 2d 451, 454 (S.D.N.Y. 2005) (granting defendant's motion on the pleadings where "the only domestic activity plaintiff alleges to have occurred in connection with the unauthorized distribution is the mere authorization of that activity."); *Space Imaging Eur., Ltd. v. Space Imaging L.P.*, No. 98 Civ. 2291 (DC), 1999 U.S. Dist. LEXIS 10898, at *13 (S.D.N.Y. July 15, 1999) (granting motion for summary judgment in part on the conclusion that defendant's "alleged misconduct was not related to conduct affecting U.S. commerce."); *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 170–71 (S.D.N.Y. 1998) (finding allegations that "defendants [who were American citizens] engaged in an organized scheme pursuant to which Jeanswear sent promotional materials to prospective purchasers which invited them to come to its U.S. showrooms to view, negotiate for and purchase Calvin Klein jeans for unrestricted international distribution" sufficient to defeat

a motion to dismiss); *but see P&G v. Colgate-Palmolive Co.*, No. 96 Civ. 9123 (RPP), 1998 U.S. Dist. LEXIS 17773, at *199 (S.D.N.Y. Nov. 5, 1998).

In the present case, there is no question that defendants infringed plaintiff's mark in U.S. commerce by advertising on their website (and those of others) their availability to perform as "First Ladies of Chic." They signed and negotiated contracts to perform as "First Ladies of Chic." They concede that they undercut plaintiff's booking fee by agreeing to perform for less money. (*See* Pl's Opp'n 9.) Whether the eventual performance was in the U.S. or abroad, it is undisputed that defendants directed, coordinated, and operated their "First Ladies of Chic" enterprise from the U.S. That is, save for the actual performance abroad, defendants "conducted [their] business almost exclusively within the United States and used the instrumentalities of American commerce to profit at [plaintiff's] expense without regard to where the [infringing performances] ultimately occurred or whether those [performances] violated American law." *Aerogroup Int'l v. Marlboro Footworks*, 955 F. Supp. 220, 230 (S.D.N.Y. 1997); *cf. World Book, Inc. v. IBM Corp.*, 354 F. Supp. 2d 451, 454 (S.D.N.Y. 2005) (finding that Lanham Act did not apply to alleged foreign infringement where only supporting domestic activity was the "mere authorization" of the foreign infringement). Moreover, defendants materially advanced their foreign infringement with their domestic infringement: as part of their effort to attract bookings and concertgoers, defendants advertised their availability to perform anywhere as "First Ladies of Chic" on their own website, www.ladiesofchic.com, and on the websites of American promoters and talent agencies, thus using plaintiff's mark in American commerce in a way that was likely to confuse domestic as well as foreign consumers. That defendants' support of their foreign

infringement was itself likely to confuse U.S. consumers further distinguishes this case from cases like *Totalplan Corp. of Am. v. Colborne*, 14 F.3d 824 (2d Cir. 1994). There, the Second Circuit held that a foreign defendant's packaging and transport of allegedly infringing cameras in U.S. commerce did not constitute a substantial effect on U.S. commerce. *Id.* That use of the instrumentalities of U.S. commerce, however, did not itself result in the likely confusion of American consumers. Likewise in *P&G v. Colgate-Palmolive Co.*, No. 96 Civ. 9123 (RPP), 1998 U.S. Dist. LEXIS 17773, at *199 (S.D.N.Y. Nov. 5, 1998), where the court found that the Lanham Act did not apply to allegedly infringing advertisements broadcast exclusively abroad that were filmed and reviewed in the U.S., there was no evidence to suggest that the American activities were themselves infringing. By contrast, it is well-settled that the Lanham Act applies to an American defendant's foreign infringement where that infringement results in a likelihood of a confusion of American consumers, such as when products bearing the infringing mark make their way back into the U.S. *See Atl. Richfield*, 150 F.3d at 193 (citing *Steele v. Bulova Watch Co.*, 344 U.S at 286–87). The Court sees no reason why the Lanham Act should not also apply where a U.S. citizen's foreign infringement is materially furthered by infringing domestic activities that will likely confuse American consumers.

## CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment on its Lanham Act claim [94] is granted and defendants' motion for summary judgment [92] is denied. A pretrial conference regarding the terms of a permanent injunction as well as

plaintiff's claim for damages and attorney's fees shall be held on May 2, 2008 at 11:00

a.m.

SO ORDERED.

Dated: New York, New York
       March 31, 2008

Richard J. Holwell
United States District Judge